May it please the Court, Wendy Sanchez for the petitioner Xander Duran. I would like to reserve two minutes for rebuttal, please. The central issue in this case is what set of circumstances constitute exceptional circumstances in order to effectively rescind an order of deportation issued in absentia. In order to determine these exceptional circumstances, the Court must look at all the facts present in this particular case in their totality. The petitioner here, Xander Duran, is an El Salvadorian national and citizen with three U.S. citizen children. She originally entered the United States... Children born here? Pardon? Children born in the United States? Yes. She has three U.S. citizen children, all born here, ranging in age from 14 to 6. Petitioner first entered the United States in 1989 and lived in the United States continuously for 13 years, until November of 2002, when she departed temporarily to visit her ill mother-in-law. She was outside the United States for three weeks. On November 27, 2002, she attempted to reenter the United States, where she was apprehended by immigration and detained. From November 27, 2002 until January 16, 2003, she was detained for an entire period and never appeared for an immigration court hearing. During that time that she was detained, her hearing was rescheduled twice. Yet she never appeared, and she was never given an oral warning of the consequences of failing to appear for her immigration court hearing. You say she was detained. She was in custody? That's correct, Your Honor. For how long? From November 27, 2002 until January 16, 2003, almost seven weeks, Your Honor. She was released on January 16, 2003, pursuant to a posting of a bond. Although she was already out of custody, immigration then issued her another hearing notice and sent it to her at the detention facility, even though she wasn't there anymore. The following day, they issued her a fourth notice and sent that to her home. That notice she did receive. She does not dispute not receiving that notice. However, the petitioner, Zana Duran, is illiterate. She is unable to read or write English and unable to read and write Spanish. Knowing this, she diligently went to a friend and asked her friend to read the notice to her to tell her when her court date was so that she would ensure that she would not miss it. The friend, unfortunately, read the notice wrong. The notice was stamped dated January 22, 2003, and the hearing was for March 11, 2003. So the friend told her the hearing was on March 22, 2003. He mixed up the numbers. The petitioner had no reason to doubt what her friend told her. She didn't realize that what information he gave her was wrong. In result, the petitioner, Ms. Duran, failed to appear for her hearing on March 11, 2003. That was a Tuesday. After she failed to appear, the immigration judge ordered her deported in absentia and sent that notice to her at her home. When she received the notice and found out that it was an order of deportation, she immediately voluntarily presented herself to the bail bond office on Friday, so three days after the deportation order was issued in absentia. She went to the bond office to ask for assistance, to ask for clarification, to explain what exactly had occurred. The bond office told her, come back on Monday with the lawyer. It was a Friday afternoon. It was a weekend. She couldn't find a lawyer. She went back there on Monday voluntarily, where she surrendered herself to immigration. She was then re-detained. In detention, she received some instructions about how to file a motion to reopen, and she did so. Eight days after she was re-detained, she did file a motion to reopen, but it was in Spanish. With the assistance of a detainee, also with her detention facility, she wrote that in Spanish, and it was rejected by the court because it was in a foreign language. She then re-filed again, pro se, in English on April 23, 2003. The instructions that she was given for filing the motion to reopen only said that she had to submit the original of the motion and any supporting documents. It didn't clearly state that she had to file an affidavit from the friend who gave her the wrong information. It didn't state that she had to file her complete application for relief. This is a layperson who would not understand what it means to file all supportive documents necessary for her case. Certainly, her motion to reopen was one prepared by someone who was unsophisticated, unfamiliar with what would be required for a motion to reopen. After she filed the motion to reopen, the immigration judge denied it. But did somebody help her with that? There was a detainee, a fellow detainee. A detainee who helped her. Who helped her. But she had no counsel. This was all done pro se on her part. The immigration judge then denied the motion to reopen, finding that there was no exceptional circumstances in her case. She did file a notice to appeal, pro se again, and then she was able to find pro bono counsel to help her with filing the appeal brief. In this case, Petitioner had no recent delayed proceedings. As mentioned earlier, she originally entered the United States in 1989 and lived continuously until 2002. She had three U.S. citizen children. Her oldest child suffers from hearing problems and has to have ear tubes put in his ear and requires special medical attention. She had a prima facie case for non-legal permanent resident cancellation of removal. She did not attach that application to her original motion to reopen because she was not put on notice that she needed to do that. She was doing all of this pro se. While she was confined. This is correct, Your Honor. All of her motions to reopen were filed while she was confined in detention proceedings. She is illiterate. She didn't realize that her friend gave her the wrong court date. She did not make the voluntary choice to not appear for her hearing. She had no reason to question the date that her friend told her. She relied on the information that he gave her. And then when the situation happened the way it did, she could have, when she received the deportation order, ignored it and gone on living in the United States. But she didn't do that. She voluntarily went to the bond office and then voluntarily surrendered herself to immigration. These actions show that this is an individual who wanted to comply with the immigration court hearings and wanted to regularize her status. This is not indicative of an individual who wanted to delay her proceedings or delay the inevitable of an issue of deportation. And, moreover, she was eligible for cancellation of removal. As part of her appeal brief, her pro bono counsel did submit a cancellation of removal application, yet the BIA in their decision failed to address that issue. The BIA, in finding that she did not meet exceptional circumstances, only stated that because she failed to submit an affidavit from her friend, she failed to meet the test, didn't consider any of the other factors argued in the brief, her illiteracy, the confusion about the date, the rescheduling of the immigration court hearings while she was in custody. Because of that, the BIA acted irrationally and didn't consider all of the circumstances in their totality. I have to reserve two minutes for a rebuttal. Thank you, Your Honor. May it please the Court. My name is Jennifer Lovings from the Department of Justice, and I represent the Attorney General in this matter. Because Petitioner concedes service of the hearing notice and does not contest the validity of the notice or that she's removable, the only issue before the Court is the reason for Petitioner's failure to appear and whether she's established exceptional circumstances in doing so. Under the regulation, as I'm sure this Court is aware, exceptional circumstances are usually a rise to the level of a death. That's what I'm aware of. I'm a little bit ashamed of our country as I listen to this. That's what I'm aware of. Your Honor, I'm not sure why, but did you have something particularly I can address for you? Yeah. I mean, the immigration service, they sent out notices, and they all came with a delay, didn't they? No, Your Honor. Weren't there a series of mistakes that the INS made? No, Your Honor. Petitioner was in custody, and she was served with several notices of hearing change dates because she was on the detention document or on the detention docket. She was released on January 16th. They had they did issue a notice of hearing to her in custody on January 21st, which is at AR, the administrative record 115. She had actually been released, so they issued a new notice of hearing on January 22nd, transferring her to the non-detained docket and telling her her hearing was now on March 11th, 2003. Petitioner does not contest that she did not receive this. She admits that she received this hearing, so she was aware of the March 11th. I have some notes here, and correct me if I'm wrong. Here, the government's brief inaccurately states that the January 21, 2003 notice set a date of February the 6th, 2003 for the hearing. Actually, that was the January 14th, 2003 notice set the date of hearing for February 6th. There's one mistake, right? In the government's brief, Your Honor, not from the INS. In the government's brief, yeah. The date of hearing set by that notice was February the 7th, 2003. Is that correct? Your Honor, I didn't brief the case. That was the date. But they set a date, and they noticed that February the 6th. She got, if I may, on January 14th, she got a notice of hearing in custody that stated she was required to appear on February 6th. On January 21st, a new notice was issued saying that the hearing date had been changed to February 7th. So if there was an error in the government's brief, the government apologizes for that. But it's clear from the record that she received these notes. Well, I mean, if the government can make mistakes, then the government's brief also states, and I think it's inaccurate, that she was released from INS custody after the January 21st notice. Your Honor, she was released on January 16th, and I apologize. I did not brief the case. Well, I know, but you're the Justice Department. So there's another inaccuracy. Your Honor. The record shows that she was released on the 16th. And in the IJ's decision states that the INS issued the original notice to appear on December the 12th, 2002, when that was issued on December the 16th, 2002. So those dates are followed up, right? I believe the notice to appear at page 130 of the record is dated December 12th, 2002, according to my record. And when was it issued? It was actually served on her in person and read to her in Spanish on December 16th, 2002. And she was at that time given oral warnings in Spanish of the consequences for failure to appear. So that was while she was in custody. So she did receive oral notice in Spanish of the consequences for failure to appear. Who gave her that notice? It looks like it was delivered to her. I can't read the signature of the officer, the immigration officer who served it on her, but Petitioner did sign it, if you look at page 131 of the record, that she did receive it and she was given those oral warnings in Spanish. Let me ask you about something in the BIA's decision, in particular when the BIA recites that the respondent has failed to demonstrate exceptional circumstances, which is the principal conclusion it appears that they come to and the one that's the most important here. But I have to say what struck me as a little, not entirely a non sequitur, but what the decision goes on to say as an E.G. or for example, a comment that speaks to the quality of evidence, not to the justification. Specifically it says, E.G., the record does not contain an affidavit from the individual who allegedly misread to her the hearing notice indicating a wrong hearing date. And to me that doesn't really follow. That doesn't demonstrate the lack of exceptional circumstances. That talks about how well she proved up the explanation that she offered. In particular, it doesn't say that the explanation that she offered doesn't rise to the level of exceptional circumstances, which what I thought I would see in that parenthesis. So can you explain to us what the basis, I mean, how this isn't a non sequitur? Well, Your Honor, I believe that the reason they included that language would be in her motion to reopen, she never made any claim that a neighbor told her anything. She just said she was confused about the dates. It wasn't until we get to this point before the board that she says that there's a neighbor who misadvised her. So if you take a look at her motion to reopen, it doesn't state anything about being misadvised by a neighbor. So there was some. But who prepared that motion to reopen? She did, pro se, while in detention. But she didn't, I mean, that's not, I don't think it's, the government would submit that it's not unreasonable for an alien to state I was misadvised by my neighbor. What she says was there wasn't enough notice time. Well, I mean, did she write it? It's handwritten, it appears, by her. I mean, did she write it? She wrote it, yes, Your Honor. I thought she was illiterate. Well, it appears she wrote it. It's printed out in English, so she may have had somebody translate it for her. She probably wrote it, and I don't know who she got to help her. She's illiterate. You heard that. Yes, she claims that she's illiterate. She does say that she speaks and reads some Spanish. You can't read or write. Well, she does speak and read some Spanish, so possibly she wrote it out in Spanish or had somebody help her and then had it translated. She's illiterate in Spanish. She can't write Spanish either. Well, Your Honor, there's no contempt. She's probably sitting there with some inmate, telling the person a story, and the person just puts their, you know, shortens it up and puts their view on it. Well, there's no, she's never contempt, she's never made that up. That goes on all the time. I'm sorry. That goes on all the time. She hasn't made that allegation before this Court that there was anything missing from that. There's no judicial notice that these things are the way they're prepared. That's another thing that we have. You know, people that guide these folks, many of them don't know what they're doing. They take their money. You know, they're notorios. They disappear. Well, Your Honor, this is a person in prison. There was no notario involved. Yeah, well, but we could have had somebody go in there and sit down, an official, and read it to her in Spanish and answer her questions and take it down, help her out. It could have, Your Honor. And I would like to point out that that would be speculation and conjecture on the part of this Court, which this Court has numerous times gotten on immigration judges for speculating. So I don't think the Court should be engaging in speculation as to what might have happened. What immigration judge have I gotten on for speculating? Well, this Court has certainly written enough opinions that tell immigration judges they shouldn't speculate about things. So, I mean, that would be pure speculation. Possibly it could have happened. However, a Petitioner here has never made that claim that this was translated erroneously. So the immigration judge, when he had her motion to reopen, all he had was I was confused, there wasn't enough time for me to get to the hearing. And her motion to reopen states that she fears going back to her country. It doesn't say anything about me possibly being eligible for cancellation or removal. So it appears she's raising an asylum claim. So that was the motion to reopen the immigration judge had before him. So I'm not sure if that answers your question, Your Honor, about why the Board added that language. But certainly, it can't we would presume that the Board did consider the entire totality of circumstances, especially since they say they did, even under the totality of circumstances, Petitioner's assertion that a neighbor told her the wrong date would not meet exceptional circumstances, not even under this Court's case law. This case is much more like the Valencia-Fergosa case or the Sharma case, where the Court found that the circumstances, being late four hours for a hearing date, did not rise to the level of exceptional circumstances. This is not like the Lowe case in which the Petitioner there had an ineffective assistance of counsel claim, where counsel's attorney or counsel's secretary specifically advised the alien that his hearing date wasn't for a few more days, and he relied on that. Also, in the Lowe case, unlike this case, the Petitioner there had evidence of substantial evidence of eligibility for cancellation of removal, which we don't have here. We just have an application. What the government wants to do is kick this woman out of the country, right? Your Honor, at this point, it appears Is that what we want to do? That's why we're here, Your Honor. She's removable. What's going to happen to those three kids that are born in this country? She stated that they, in her, I believe it's in her cancellation application, that they will stay with their undocumented father who lives here as well. You take the mother away, huh? And what about family values and keeping families together? I'm sorry, Your Honor, I'm just doing my job. I know it's your job, but, you know, maybe, well, we've got to think about these things, don't we? This is a democratic country. Yes, Your Honor. And we're supposed to be concerned about people, aren't we? But we want to throw people out, break up families. I've got a sick boy. I understand your concerns, Your Honor. And I see that I'm just about out of time. Is there anything else I can address for you that concerned you? No, but I appreciate your coming here. I hope you had a good time. Thank you. Thank you. The weather's nice here in Pasadena. It is, Your Honor. Look at our trumpet trees out here. See the yellow ones? Your Honor, it is true that the respondent in her pro se motion to reopen did not assert her eligibility for cancellation of removal for non-legal permanent residence. However, as a layperson pro se, she wouldn't understand what cancellation of removal for non-legal permanent residence is. It's a sophisticated area of the law that would require an attorney to advise her of her eligibility for that. She knew she was afraid to go back to her home country, so that's what she stated. She was assisted by another detainee at the detention facility to write that motion to reopen. And looking at her motion to reopen, it's not written proper English. It's very unsophisticated. This was written by an individual pro se without any sort of assistance. The BIA did not consider the totality of circumstances here. In saying that she did not show exceptional circumstances, all they said was she did not present an affidavit from her friend. They did not address her illiteracy. They did not address the fact that she wrote the original motions to reopen pro se. They did not consider the multiple rescheduling of hearings that occurred. And they did not consider her actions after being ordered in a deporter in absentia. The fact that she wrote those. The BIA is an appellate panel, so it's principally reviewing the record that's before it, and the record was made before the IJ. Correct. And is there a reason why at least these facts weren't put before the immigration judge? Well, Your Honor, the Respondent filed the motion to reopen pro se. She didn't have the sophistication to argue with me. So there's no follow-up, or? Unfortunately not, because she had already filed a notice to appeal when she filed pro bono counsel. Okay. And so the pro bono counsel went forward with the appeal and did the appeal brief and presented for cancellation of application. The supplemental materials didn't show up until you got to the BIA level, because Correct, Your Honor. That's correct. Ms. Sanchez, I have a question which is purely an aside. I'm curious how a woman such as Mrs. Duran ultimately obtains counsel. It's obvious that you've stepped in and someone before you, I assume. Can you outline that process for me? Absolutely, Your Honor. I come from an organization. It's a nonprofit in San Diego. And one of our programs is to go to the detention facility and interview potential clients who need relief who can't afford to pay for an attorney. And we happened to find Ms. Duran because she indicated she was afraid to go to her home country. And that's how we happened upon her and learned about her case. All right. What's the name of your organization? Casa Cornelia Law Center, Your Honor. Casa what? Casa Cornelia. Oh, Casa Cornelia. Correct. Okay, well. So did your organization represent her before the BIA? Yes, Your Honor, we did. All right. And we represent her pro bono throughout. All right. Thank you. Thank you, Your Honor. Well, good job. Thank you. All right. Thank you. The matter will stand submitted.
judges: Pregerson, Clifton, Hicks